## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | |
|---|---|
| SHERRY GAUL and STEPHANIE LUKIS, individually and on behalf of all others similarly situated, | Case No. 21-cv-01313 |
| *Plaintiffs*, | Honorable James E. Shadid |
| *v.* | |
| CHECKPEOPLE, LLC, | |
| *Defendant*. | |

## PLAINTIFFS' MOTION FOR AND MEMORANDUM IN SUPPORT OF
## <u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND........................................... 2

    A.      The Illinois Right of Publicity Act................................................... 3

    B.      Plaintiffs' Allegations. ...................................................................... 3

    C.      Litigation, Negotiation, and Settlement. ........................................... 4

III.    TERMS OF THE SETTLEMENT AGREEMENT .............................................. 7

    A.      Class Definitions. .............................................................................. 7

    B.      Monetary Relief. ............................................................................... 7

    C.      Prospective Relief. ............................................................................ 9

    D.      Payment of Settlement Notice and Administrative Costs.................. 9

    E.      Payment of Attorneys' Fees, Costs, and Incentive Award. .............. 9

    F.      Release of Liability. ........................................................................ 10

IV.     THE CLASS NOTICE FULLY SATISFIED DUE PROCESS ......................... 10

V.      CERTIFICATION OF THE SETTLEMENT CLASSES SHOULD BE
        CONFIRMED FOR PURPOSES OF FINAL APPROVAL ............................. 12

VI.     THE SETTLEMENT WARRANTS FINAL APPROVAL................................. 12

    A.      Plaintiffs and Class Counsel Adequately Represented the Class........................ 14

    B.      The Settlement Is the Product of Arm's-Length, Non-Collusive
        Negotiations. ................................................................................... 16

    C.      The Settlement Treats Class Members Equally. ............................... 17

    D.      The Relief Secured for the Settlement Classes Is Adequate and
        Warrants Final Approval.................................................................. 18

        1.      The Settlement provides exceptional relief to the Settlement
            Classes....................................................................................19

        2.      The benefits of settlement outweigh the cost, risk, and delay
            of further litigation. ...............................................................21

        3.      The method of distributing relief to the Damages Settlement
            Subclass is effective and supports final approval ..................23

        4.      The terms of the requested attorneys' fees are reasonable. ......................25

    E.      The Remaining Considerations Set Forth by the Seventh Circuit
        Support Approval of the Settlement. ................................................ 26

        1.      The Reaction of the Settlement Classes Favors Approval.........................26

i

2.    Experienced Counsel's Belief that the Settlement is
Beneficial to the Class Weighs in Favor of Final Approval. ....................27

3.    The Settlement Raises No Red Flags. ........................................................28

VII.    CONCLUSION ............................................................................................ 29

## **TABLE OF AUTHORITIES**

**PAGE(S)**

CASES

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
   2011 WL 3290302 (N.D. Ill. July 26, 2011) ............................................................. 15

*Am. Int'l Grp., Inc., v. ACE INA Holdings, Inc.*,
   2012 WL 651727 (N.D. Ill. 2012) ........................................................................... 26

*Bonilla v. Ancestry.com Operations Inc.*,
   628 F. Supp. 3d 812 (N.D. Ill. 2022) ...................................................................... 22

*Chambers v. Together Credit Union*,
   2021 WL 1948453 (S.D. Ill. May 14, 2021) ............................................................ 14

*Charvat v. Valente*,
   2019 WL 5576932 (N.D. Ill. Oct. 28, 2019) ...................................................... 16, 23

*Dancel v. Groupon, Inc.*,
   2019 WL 1013562 (N.D. Ill. Mar. 4, 2019) ............................................................. 22

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ................................................................................................ 11

*Eubank v. Pella Corp.*,
   753 F.3d 718 (7th Cir. 2014) .................................................................................. 29

*Fischer v. Instant Checkmate LLC*,
   2022 WL 971479 (2022) ......................................................................................... 22

*Fraley v. Facebook, Inc.*,
   966 F. Supp. 2d 939 (N.D. Cal. 2013) .................................................................... 20

*Golan v. FreeEats.com, Inc.*,
   930 F.3d 950 (8th Cir. 2019) .................................................................................. 23

*Goldsmith v. Tech. Sols. Co.*, No. 92 C,
   1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ......................................................... 21

*In re Advocate Aurora Health Pixel Litig.*,
   2024 WL 3357730 (E.D. Wis. July 10, 2024) ......................................................... 20

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
   789 F. Supp. 2d 935 (N.D. Ill. 2011) .................................................................. 19, 23

*In re Forefront Data Breach Litig.*,
2023 WL 6215366 (E.D. Wis. Mar. 22, 2023) ................................................................ 8

*In re Google Plus Profile Litigation*,
2021 WL 242887 (N.D. Cal. Jan. 25, 2021) ................................................................. 20

*In re Google Referrer Header Privacy Litig.*,
869 F.3d 737 (9th Cir. 2017) ........................................................................................ 20

*In re NCAA Student-Athlete Concussion Injury Litig.*,
332 F.R.D. 202 (N.D. Ill. 2019) .................................................................................... 14

*McDaniel v. Qwest Commc'ns Corp.*,
2011 WL 13257336 (N.D. Ill. Aug. 29, 2011) .............................................................. 27

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ...................................................................................................... 17

*Pearson v. NBTY, Inc.*,
772 F.3d 778 (7th Cir. 2014) ........................................................................................ 13

*Perlin v. Time Inc.*,
237 F. Supp. 3d 623 (E.D. Mich. 2017) ....................................................................... 23

*Pollard v. Remington Arms Co.*, LLC,
320 F.R.D. 198 (W.D. Mo. 2017) .................................................................................... 8

*Redman v. RadioShack Corp.*,
768 F.3d 622 (7th Cir. 2014) ........................................................................................ 13

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ........................................................... 27, 28

*Schneider v. Chipotle Mexican Grill, Inc.*,
336 F.R.D. 588 (N.D. Cal. 2020) .................................................................................... 8

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ..................................................................... passim

*Snyder v. Ocwen Loan Servicing, LLC*,
2018 WL 4659274 (N.D. Ill. Sept. 28, 2018) ............................................................... 14

*Snyder v. Ocwen Loan Servicing, LLC*,
2019 WL 2103379 (N.D. Ill. May 14, 2019) ..................................................... 13, 15, 17

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) ........................................................................................ 14

iv

*T.K. through Leshore v. Bytedance Tech. Co., Ltd.*,
  2022 WL 888943 (N.D. Ill. Mar. 25, 2022) ................................................... passim

*Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*,
  309 F.3d 978 (7th Cir. 2002) .......................................................................... 13

*United States v. Dish Network L.L.C.*,
  954 F.3d 970 (7th Cir. 2020) .......................................................................... 23

*Wakefield v. ViSalus, Inc.*,
  51 F.4th 1109 (9th Cir. 2022) ......................................................................... 23

*Wong v. Accretive Health, Inc.*,
  773 F.3d 859 (7th Cir. 2014) ..................................................... 14, 15, 19, 26

*Young v. Rolling in the Dough, Inc.*,
  2020 WL 969616 (2020) ................................................................................. 23

## STATUTES

765 ILCS 1075 ................................................................................................... 1

765 ILCS 1075/5 ................................................................................................ 3

765 ILCS 1075/10 .............................................................................................. 3

765 ILCS 1075/30(a) .......................................................................................... 3

765 ILCS 1075/40 .............................................................................................. 3

765 ILCS 1075/50 ............................................................................................ 10

## RULES

Fed. R. Civ. P. 23 ..................................................................... 11, 12, 13, 18

Fed. R. Civ. P. 23(c)(2)(B) ......................................................................... 11

Fed. R. Civ. P. 23 (e) ....................................................................... 13, 14, 26

Fed. R. Civ. P. 23 (e)(2) ........................................................................ passim

Fed. R. Civ. P. 23(e)(2)(B) ......................................................................... 16

Fed. R. Civ. P. 23 (e)(2)(C)(ii) .................................................................. 24

Fed. R. Civ. P. 23(e)(2)(C)(iii) .................................................................. 25

Fed. R. Civ. P. 23(e)(2)(C)(iv) ................................................................... 18

Fed. R. Civ. P. 23 (e)(2)(C) ....................................................................... 16, 18, 25, 26

Fed. R. Civ. P. 23(e)(2)(D) ............................................................................... 17

**OTHER AUTHORITIES**

4 Newberg on Class Actions § 13:53 (6th ed.) ............................................... 24

## I.     INTRODUCTION

Plaintiffs Sherry Gaul and Stephanie Lukis allege that Defendant CheckPeople violated the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075, by using their and other Illinois residents' identities to sell online subscriptions to its people-search database without their consent. After nearly two and a half years of litigation and months of negotiations, including a mediation with the Honorable Morton Denlow (Ret.), the Parties reached a Class Action Settlement Agreement that would resolve this case in exchange for significant relief to Settlement Class Members.[1]

Following the Court's preliminary approval of the Settlement, Class Counsel and the Settlement Administrator ensured that a comprehensive Notice plan was carried out, which reached more than 97% of the Damages Settlement Subclass, all of whom were entitled to send in a Claim Form for a cash payment. (*See* Declaration of Jacob Kamenir ("Kamenir Decl.") ¶ 16.) Against a backdrop of settlements that are regularly approved with low-single-digit claims rates, the response to the Notice campaign here was significant: 11.14% of the Damages Settlement Subclass Members sent in Approved Claims, (*see id.* ¶ 11), and those individuals can expect to receive a net settlement payment of approximately $360 each, (Declaration of Philip L. Fraietta ("Fraietta Decl.") ¶ 19.) The lack of objections and opt-outs is just as reflective of the Settlement's strength. Not a single person submitted an objection or opt-out request. (Kamenir Decl. ¶ 18.)

Now that the Notice process is complete, and in light of the Settlement Classes' favorable response and the exceptional benefits that the Settlement secures, Plaintiffs respectfully submit

---

[1]     Capitalized terms used in this motion are defined in the Class Action Settlement Agreement (the "Settlement" or "Settlement Agreement"), attached as Exhibit 1 to the Declaration of Philip L. Fraietta.

that the Settlement is deserving of final approval. Foremost, the Settlement provides a non-reversionary Settlement Fund of $2,598,050 for those Illinois residents whose names were searched and clicked on by a user who subsequently purchased a CheckPeople subscription (the Damages Settlement Subclass). As mentioned, Damages Settlement Subclass Members who sent in Approved Claims can expect Settlement payments amounting to hundreds of dollars per person. This means the Settlement exceeds earlier right of publicity settlements both in terms of per-person recovery and the overall amount of the Settlement Fund relative to the Damages Settlement Subclass's size. *See, e.g.*, *Butler v. Whitepages, Inc.*, No. 19-cv-04871, dkt. 277 (N.D. Ill., Sept. 29, 2022) (granting final approval to IRPA settlement with $1,208,440 fund based on 30,211 class members, or $40 per class member, with valid claimants receiving net settlement payments of $95). Furthermore, for all Illinois residents in CheckPeople's database (the Injunction Settlement Class), regardless of whether they were searched by a user who purchased a subscription after clicking on their profile, CheckPeople has agreed to stop displaying these individuals' names on any page on its website that includes a subscription offer to its products or services. This forward-looking relief ends the conduct that led to the lawsuit in the first instance. A tailored release ensures that Class Members do not give up damages claims against CheckPeople unless they are eligible to claim a monetary payment as Damages Subclass Member.

As detailed below, all of the relevant Rule 23 factors support granting final approval here. Thus, Plaintiffs respectfully request that the Court confirm its certification of the Settlement Classes for purposes of entering final judgment, grant final approval to the Settlement, and allow relief to be distributed to the Settlement Classes.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Though Plaintiffs have detailed this case's background in their preliminary approval

motion and motion for attorneys' fees, (dkts. 40, 43), it is set forth in brief below for ease of reference.

**A.      The Illinois Right of Publicity Act.**

The IRPA establishes that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent" from that individual. 765 ILCS 1075/30(a). The statutory definition of "identity" includes "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice." 765 ILCS 1075/5. A "commercial purpose," in turn, is "the public use or holding out of an individual's identity," which can be "(i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services" or "(ii) for purposes of advertising or promoting products, merchandise, goods, or services." *Id.* In passing the IRPA, the Illinois legislature codified the common law tort of "appropriation of likeness," providing that "[t]he right to control and to choose whether and how to use an individual's identity for commercial purposes is recognized as each individual's right of publicity." 765 ILCS 1075/10. Under the IRPA, an individual may obtain actual damages, profits flowing from a defendant's use of his or her identity, or $1,000. 765 ILCS 1075/40.

**B.      Plaintiffs' Allegations.**

CheckPeople owns and operates a website, www.checkpeople.com, that sells "reports" on individuals to the general public. (Dkt. 36 ¶¶ 1-2.) The website allows a prospective customer to perform a free search for an individual—by typing the individual's first and last name into a search bar—then, CheckPeople displays a list of people in CheckPeople's database who match the name provided by the user. (*Id.* ¶¶ 3-4.) The search results provide a free preview of CheckPeople's reports featuring the searched individual's name (including middle initials), age,

current city and state of residence, the searched individual's relatives, and other identifying information.[2] (*Id.* ¶ 5.) The preview page encourages the searcher to view any person's "Report" generated by CheckPeople. To do so, a user must start a "3-Day Trial Pass" of CheckPeople's subscription services for $4.99, which automatically converts into a recurring, negative option subscription package costing $29.16 every month. (*Id.* ¶ 11.) Buying a paid subscription from CheckPeople allows customers to access additional information not only about the searched individual, but also about every individual in CheckPeople's database. (*Id.* ¶ 13.) Plaintiffs allege that the use of their and others' identities to induce users to purchase CheckPeople subscriptions without first obtaining their consent violates the IRPA. (*See generally* dkt. 36.) CheckPeople has denied these allegations.

### C.    Litigation, Negotiation, and Settlement.

On November 1, 2021, Gaul filed a putative class action complaint against CheckPeople in this Court alleging IRPA violations. (Dkt. 1.) CheckPeople moved to dismiss the complaint, arguing that Plaintiff Gaul failed to properly plead the "public use" of her identity within the meaning of IRPA or that CheckPeople used her identity for a commercial purpose. (Dkt. 7.) CheckPeople also argued that Plaintiff Gaul's class allegations must be stricken because the class is not ascertainable. (*Id.*) After these issues were fully briefed, the Court denied CheckPeople's motion in its entirety. (Dkt. 14.) Shortly thereafter, CheckPeople answered the complaint, denying Gaul's material allegations and asserting various affirmative defenses. (Dkt. 15.)

The Court then entered a discovery plan, pursuant to which the Parties engaged in written discovery and exchanged document productions. (Fraietta Decl. ¶ 7.) As part of this discovery

---

[2]     On March 31, 2023, CheckPeople made certain changes to the screenflow of its website's search process, as described below. (Fraietta Decl. ¶ 9.) This section describes the website's operation at the time the complaint was filed.

exchange, Gaul obtained key information regarding the composition of the putative class—including how many individuals with Illinois addresses were searched and clicked on by someone who subsequently purchased a subscription—and the types of data that CheckPeople maintained related to its website and its visitors. (*Id.* ¶ 8.) Plaintiff Gaul also learned that CheckPeople made certain changes to its website following the lawsuit, including changes implemented on March 31, 2023 that edited the screenflow of the search results on the website and the information presented therein. (*Id.* ¶ 9.)

In parallel with their litigation and discovery efforts, the Parties explored the possibility of settlement. (*Id.* ¶ 10.) These preliminary settlement discussions included not only Gaul's case, but also the claims of another potential plaintiff, Stephanie Lukis, who was represented by Plaintiff Gaul's counsel and whose name was searched resulting in a subscription purchase. (*Id.* ¶ 11.) The Parties were discussing amending the pleadings to include Plaintiff Lukis when they ultimately agreed to attend a mediation focused on reaching a global settlement of all right of publicity claims at issue in the lawsuit, including those that would be asserted by Plaintiff Lukis. (*Id.* ¶ 12.)

As fact discovery closed, the Parties agreed to mediate with the Honorable Morton Denlow (Ret.), formerly of the Northern District of Illinois and now a mediator with JAMS. In advance of the mediation, and having already exchanged the discovery necessary to negotiate their respective positions, the Parties exchanged comprehensive mediation briefs. (*Id.* ¶ 13.) CheckPeople's discovery productions and mediation brief made clear that CheckPeople had effectively no ability to finance a settlement in excess of its insurance policy, and that this would be a constraining factor in the settlement negotiations. (*Id.* ¶ 14.) Specifically, this data demonstrated that obtaining complete monetary relief to every Illinois resident in CheckPeople's

database was not viable either in settlement or in litigation. (*Id.* ¶ 15.)

After the Parties submitted their mediation briefs, they attended a full-day mediation where they participated in arm's length settlement discussions facilitated by Judge Denlow. (*Id.* ¶ 16.) At the end of the mediation, Judge Denlow issued a mediator's proposal to settle the case, which both Parties accepted, thereby reaching an agreement-in-principle to settle the case. This proposal included injunction and damages settlement classes, represented by Plaintiff Gaul and Plaintiff Lukis, respectively. (*Id.* ¶ 17.) The Parties executed a binding memorandum of understanding that was formalized into the Settlement Agreement.

Plaintiff Gaul subsequently filed an unopposed motion to amend her complaint to add Stephanie Lukis as a plaintiff and proposed class representative of the Damages Settlement Subclass, (dkt. 35), which the Court granted on March 22, 2024. Plaintiffs filed their First Amended Complaint on March 25, 2024. (Dkt. 36.) Plaintiffs then promptly moved for preliminary approval of the settlement (dkt. 40), which the Court granted on June 20, 2024, (dkt. 42). Most recently, Plaintiffs and Class Counsel moved for an award of attorneys' fees, expenses, and Plaintiffs' incentive awards on August 23, 2024. (Dkt. 43.)

Since the Court preliminarily approved the Settlement, Class Counsel has diligently worked to fulfill the notice requirements of the preliminary approval order. (Fraietta Decl. ¶ 27.) This has included working with the Settlement Administrator and CheckPeople to ensure that the Class List was compiled and shared with the Settlement Administrator, that the Settlement Administrator was able to complete the address and quality control checks called for in the Settlement, and otherwise working to finalize and disseminate the notice to the Damages Settlement Subclass. (*Id.*) Class Counsel also ensured that the reminder Notices called for in the Settlement were sent out to Damages Settlement Subclass to drive engagement, resulting in a

double-digit claims rate. (*Id.* ¶ 28.) In short, Class Counsel has fulfilled, and will continue to

fulfill, all obligations called for in the Settlement. (*Id.* ¶ 29.)

## III.    TERMS OF THE SETTLEMENT AGREEMENT

The terms of the Settlement are briefly summarized here:

### A.    Class Definitions.

In its order granting preliminary approval, the Court certified the following Class and

Subclass solely for the purposes of Settlement:

> <u>Injunction Settlement Class</u>: all Illinois residents in CheckPeople's database
> between November 1, 2020 through the date of preliminary approval.

> <u>Damages Settlement Subclass</u>: all Injunction Settlement Class Members (1) whose
> names were displayed on a search result page (2) where their profiles were clicked
> on by a user who subsequently purchased a CheckPeople subscription (3) between
> November 1, 2020 through March 31, 2023.

(Dkt. 42 ¶¶ 3, 5.) Excluded from the Injunction Settlement Class are (1) any judge or magistrate

judge presiding over this Action and members of their families, (2) CheckPeople, CheckPeople's

subsidiaries, parent companies, successors, predecessors, and any entity in which CheckPeople

or its parents have a controlling interest, and (3) the legal representatives, successors, or assigns

of any such excluded persons. (*Id*. § 1.17.) Excluded from the Damages Settlement Subclass are

(1) any judge or magistrate judge presiding over this Action and members of their families, (2)

CheckPeople, CheckPeople's subsidiaries, parent companies, successors, predecessors, and any

entity in which CheckPeople or its parents have a controlling interest, (3) persons who properly

execute and file a timely request for exclusion from the Settlement Class, and (4) the legal

representatives, successors, or assigns of any such excluded persons. (*Id.* § 1.8.)

### B.    Monetary Relief.

Under the Settlement, CheckPeople has established a non-reversionary Settlement Fund

in the amount of $2,598,050, that was subject to an upward adjustment of $65.00 per confirmed

Damages Settlement Subclass Member above 39,970.[3] (Settlement §§ 1.28, 6.4.) Each Damages

Settlement Subclass Member who submitted a valid Claim Form will be entitled to payment of a

pro rata share of the Settlement Fund after payment of court-approved Settlement Administration

Expenses, attorneys' fees, and any incentive award. (*Id*. § 2.1(a).) Typical consumer class actions

may see claims rates of just a few percent. *See In re Forefront Data Breach Litig.*, No. 21-CV-

887, 2023 WL 6215366, at *4 (E.D. Wis. Mar. 22, 2023) (finally approving settlement with

1.46% claims rate, collecting others); *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588,

599 (N.D. Cal. 2020) (approving settlement with 0.83% claims rate); *Pollard v. Remington Arms

Co.*, LLC, 320 F.R.D. 198, 214 (W.D. Mo. 2017), *aff'd*, 896 F.3d 900 (8th Cir. 2018) (collecting

cases from around the country granting final approval to settlements with less than 1% claims

rate). In comparison, the claims rate in this case was an exceptional 11.14%. Class Counsel

estimate that each claiming Damages Settlement Subclass Member will receive a net payment of

approximately $360. (Fraietta Decl. ¶ 19.)

This claims rate and net payment calculation includes Claim Forms that were otherwise

valid, but were submitted after the operative claims deadline in response to the Settlement

Administrator's final reminder Notice email, which was sent after obtaining additional email

addresses through skip tracing to send the email. Class Counsel respectfully request that these

claims be deemed Approved Claims for purposes of the Settlement. This claims rate calculation

also reflects the denial of certain claims that the Settlement Administrator identified as

fraudulent and not actually submitted by potential Damages Settlement Subclass Members, as

further described in the Kamenir Declaration, ¶ 21.

Any checks that remain uncashed after 180 days of issuance, and any electronic deposits

---

[3]    Confirmatory discovery affirmed that there are no more than 39,970 Damages Settlement
Subclass Members.

unable to be processed within 180 days of the first attempt, shall remain in the Settlement Fund to be distributed pro rata to claiming Damages Settlement Subclass Members, if practicable, or in a manner otherwise directed by the Court. (*Id.* § 2.1(e).) No portion of the Settlement Fund will revert back to CheckPeople. (*Id.* § 1.28.)

### C.    Prospective Relief.

CheckPeople agrees not display the identity, name, age, contact information, residence location, former residence locations, list of possible relatives, or other identifying information of any Injunction Settlement Class Member whose location, according to CheckPeople's database, remains in Illinois, on any page on its website that includes a subscription offer to CheckPeople's products or services. (*Id.* § 2.2(a).) These changes extend beyond the earlier changes that CheckPeople made in connection with its website. CheckPeople will implement the appropriate changes to its website no later than the Effective Date, as defined in section 1.12 of the Settlement Agreement. (*Id.* § 2.2(b).) CheckPeople will maintain these changes for a period of three years after the Effective Date. (*Id.* § 2.2(c).) Injunction Settlement Class Members are not providing a release in exchange for this relief. (*Id.* § 3.1.)

### D.    Payment of Settlement Notice and Administrative Costs.

All Settlement notice and administration costs shall be paid from the Settlement Fund. (*Id.* § 1.25.) This includes all expenses incurred by or on behalf of the Settlement Administrator in administering the Settlement Agreement, including expenses relating to providing Notice, processing Claim Forms, responding to inquiries from members of the Settlement Classes, and distributing payments for Approved Claims, with all such expenses to be paid from the Settlement Fund. (*Id.*) These Settlement Administration Expenses are expected to be $94,323.

### E.    Payment of Attorneys' Fees, Costs, and Incentive Award.

As part of the Settlement, CheckPeople has agreed that Class Counsel are entitled to

reasonable attorneys' fees in an amount to be determined by the Court. (*Id.* § 8.1.) Class Counsel

agreed, with no consideration from CheckPeople, to limit their request for attorneys' fees and

unreimbursed costs to thirty-five percent (35%) of the Settlement Fund, after Settlement

Administration Expenses and incentive awards are deducted. (*Id.*) CheckPeople has also agreed,

subject to Court approval, to pay each Class Representative an incentive award in the amount of

$1,000 from the Settlement Fund in recognition of the time and effort they expended on behalf of

the Class and Subclass. (*Id.* § 8.3.) Plaintiffs moved for these payments via a fee petition filed on

August 23, 2024. (Dkt. 43.)

####        F.        Release of Liability.

In exchange for the relief described above, each Damages Settlement Subclass Member

will release CheckPeople from all past and present claims or causes of action, brought or that

could have been brought, including Unknown Claims and claims for injunctive relief permitted

under 765 ILCS 1075/50, arising from the alleged use of a person's identity, name, age, contact

information, residence location, former residence locations, list of possible relatives, or other

identifying information to advertise, promote, or in connection with an offer for sale of any

products or services on CheckPeople's website, checkpeople.com, including any violation of the

IRPA. (Settlement §§ 1.23-1.24, 3.1.) As noted above, individuals who are only Injunction

Settlement Class Members and not Damages Settlement Subclass Members are not releasing any

Released Claims. (*Id.* § 3.1)

## IV.    THE CLASS NOTICE FULLY SATISFIED DUE PROCESS

Prior to granting final approval to this Settlement, the Court must consider whether the

Damages Settlement Subclass Members received "the best notice that is practicable under the

circumstances, including individual notice to all members who can be identified through

reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S.

156, 173 (1974); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011).[4] The "best notice practicable" does not necessarily require receipt of actual notice by all Damages Settlement Subclass Members in order to comport with both Rule 23 and the requirements of due process. In general, a notice plan that reaches at least 70% of class members is considered reasonable. *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* at 3 (2010), available at www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

Here, CheckPeople provided Simpluris, Inc.—the professional Settlement Administrator appointed by the Court—a Settlement Class List for purposes of providing direct notice. The Settlement Class List contained the names and addresses (to the extent in CheckPeople's possession) for 39,970 Damages Settlement Subclass Members. (*See* Kamenir Decl., ¶ 4.) After performing skip tracing to identify contact information for Damages Settlement Subclass Members that CheckPeople did not have, the Settlement Class List ultimately contained (i) the names and valid email addresses for 33,320 unique Damages Settlement Subclass Members and (ii) names and U.S. Mail addresses for 39,688 unique Damages Settlement Subclass Members. (*Id.*) On July 11, 2024, Simpluris caused the mailing of the postcard Notice with a detachable, postage prepaid Claim Form to 39,690 Damages Settlement Subclass Members. (*Id.* ¶ 15.) On the same day, the Settlement Administrator sent the Court-approved Notice via email to 21,798 Damages Settlement Subclass Members for whom at least one valid email address was available. (*Id.* ¶ 10.) The Notice via email was ultimately successfully delivered to 21,625 email addresses, and the Notice via U.S. Mail was successfully delivered to 37,708 addresses. (*Id.* ¶¶ 10, 15.) The Settlement Administrator subsequently sent multiple rounds of reminder Notices to Damages

---

[4]    The Court did not order that Notice be sent to the individuals who are only Injunction Settlement Class Members (dkt. 43).

Settlement Subclass Members who, at each point, had not yet submitted a claim. (*Id.* ¶ 11.) The reminder Notices were successfully delivered via email to 20,038 Damages Settlement Subclass Members. (*Id.*) Altogether, Simpluris was able to send direct Notice to 38,677 Damages Settlement Subclass Members, a Notice reach of 97.28%. (*Id.* ¶ 16.)

Each of these Notices directed class members to the Settlement Website, www.checkpeoplerightofpublicity.com, which has been and continues to be available 24/7 and features the "long form" Notice and important court filings (including Plaintiffs' Motion for and Memorandum of Law in Support of Attorneys' Fees, Expenses, and Incentive Awards), important deadlines, and answers to frequently asked questions. (*Id.* ¶ 8; Agreement § 4.2(d).)

Overall, the Notice program was highly successful, as direct Notice reached more than 97% of the Damages Settlement Subclass, the original Notice was supplemented with reminder Notices, and the Parties ultimately achieved exceptional participation rates. This greatly exceeds what is required for due process.

## V.    CERTIFICATION OF THE SETTLEMENT CLASSES SHOULD BE CONFIRMED FOR PURPOSES OF FINAL APPROVAL

At the preliminary approval stage, the Court certified the Settlement Classes for settlement purposes under Rule 23. The Court held that the Settlement Classes were sufficiently numerous, common questions predominate within them, the named Plaintiffs' claims were typical of their respective Classes, Plaintiffs and Class Counsel were adequate to represent the class, and that a class action was a superior method for fairly and efficiently adjudicating this matter. (Dkt. 42.) As nothing has changed to impact this finding, the Court should confirm certification of the Settlement Classes for purposes of entering the Final Approval Order.

## VI.    THE SETTLEMENT WARRANTS FINAL APPROVAL

When analyzing class action settlements, "the law quite rightly requires more than a

judicial rubber stamp[.]" *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). To

that end, the Seventh Circuit has established "the district judge as a fiduciary of the class, who is

subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY,*

*Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotations omitted).

Federal Rule of Civil Procedure 23(e) governs court approval of class action settlements

and mandates that "claims, issues, or defenses of a certified class . . . may be settled . . . only

with the court's approval . . . after a hearing and only on finding that it is fair, reasonable, and

adequate[.]" Fed. R. Civ. P. 23(e); *Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*, 309

F.3d 978, 986 (7th Cir. 2002). Rule 23(e)(2) sets out that a court must consider whether (1) the

class representative and class counsel have adequately represented the class; (2) the settlement

was negotiated at arm's length; (3) the settlement treats class members equitably relative to each

other; and (4) the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2) (eff. Dec. 1,

2018); *see, e.g.*, *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 C 8461, 2019 WL 2103379, at *4

(N.D. Ill. May 14, 2019).

The Advisory Committee for the 2018 amendments to Rule 23 recognized that "each

circuit has developed its own vocabulary for expressing these concerns[,]" and the Court should

therefore also take into account the factors set out by the Seventh Circuit. Fed. R. Civ. P. 23(e),

Advisory Committee's Note to 2018 Amendment. These factors are: "(1) the strength of the case

for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity,

length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the

reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6)

stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health,*

*Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (internal quotations omitted); *accord Synfuel Techs., Inc.*

*v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006). District courts in this Circuit continue to analyze these factors in tandem with the Rule 23(e)(2) factors to ensure that a settlement is fair, reasonable, and adequate. *See, e.g.*, *In re NCAA Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 217 (N.D. Ill. 2019) (Lee, J.).

The following discussion of the factors set out in Rule 23(e)(2) and their corresponding Seventh Circuit analogues demonstrates that the Settlement is fair, reasonable, adequate, and deserving of final approval.

### A.    Plaintiffs and Class Counsel Adequately Represented the Class.

The first Rule 23(e)(2) factor, whether the class representative and class counsel have adequately represented the class, focuses on class counsel's and the class representative's performance as it relates to the "conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e), Advisory Committee's Note to 2018 Amendment. This factor is generally satisfied where the named plaintiff participated in the case diligently, and class counsel fought vigorously in the litigation. *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 C 8461, 2018 WL 4659274, at *4 (N.D. Ill. Sept. 28, 2018); *see also Chambers v. Together Credit Union*, No. 19-CV-00842-SPM, 2021 WL 1948453, at *2 (S.D. Ill. May 14, 2021) (finding this factor satisfied when class counsel vigorously litigated the case "both through motion practice on the legal merits and through discovery"). In considering this factor, courts examine whether the plaintiff and class counsel had adequate information to negotiate a class-wide settlement, taking into account the nature and amount of discovery completed, whether formally or informally. *See Snyder*, 2018 WL 4659274 at *4. This inquiry is coextensive with the Seventh Circuit's direction to consider the "stage of the proceedings and the amount of discovery completed." *Wong*, 773 F.3d at 863 (internal quotations omitted).

The knowledge and negotiating position, participation, and conduct of Plaintiffs and

Class Counsel have not changed since this Court granted preliminary approval, which made an analogous finding of adequacy. (Dkt. 42.) Plaintiffs' interests have remained aligned with the Settlement Classes through the Notice process and preparation for final approval, including working to maximize the Notice's reach and Damages Settlement Subclass Members' participation in the Settlement. Without Plaintiffs shouldering the burden to represent the class and taking on these tasks as the lead Plaintiffs, the relief secured for the Settlement Classes would not have been possible. Given their efforts and aligned interests with the Settlement Classes, there can be no doubt that Plaintiffs have only acted in the best interest of the Settlement Classes and have therefore adequately represented them.

Likewise, Class Counsel "fought hard throughout the litigation," briefing and defeating CheckPeople's attempt to dismiss the case, "and pursued mediation when it appeared to be an advisable and feasible alternative." *Snyder*, 2019 WL 2103379 at *4. Prior to settling, the Parties exchanged formal and informal discovery, as well as multiple settlement conference briefs, providing Class Counsel with "an adequate information base" on which to negotiate the Settlement. *T.K. through Leshore v. Bytedance Tech. Co., Ltd.*, 2022 WL 888943, at *11 (N.D. Ill. Mar. 25, 2022); *see also Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302, at *8 (N.D. Ill. July 26, 2011) (noting the standard "is not whether it is conceivable that more discovery could possibly be conducted" but whether the parties have enough information "to evaluate the merits of this case").

After years of investigation and discovery, the facts underlying Plaintiffs' allegations in this case, but by no means their legal import, are now substantially undisputed: CheckPeople displayed Plaintiffs' and the class's names and other identifying information in free preview ads for its monthly subscription service, without asking for their consent to do so. Therefore, the

Settlement unequivocally meets the Rule 23(e)(2)(C) requirement.

**B.    The Settlement Is the Product of Arm's-Length, Non-Collusive Negotiations.**

Like the first Rule 23(e)(2) factor, the second factor—whether the settlement was negotiated at arm's length—addresses a "procedural" concern. Fed. R. Civ. P. 23(e)(2)(B); 2018 Committee Notes. The arm's-length negotiation requirement "aim[s] to root out settlements that may benefit the plaintiffs' lawyers at the class's expense." *T.K.*, 2022 WL 888943 at *11 (internal quotation omitted). The record here demonstrates nothing but good-faith, non-collusive bargaining between the Parties.

Here, there was no collusion between Class Counsel and CheckPeople to take advantage of the Settlement Classes. "Unlike many class action settlements in which settlement negotiations begin before discovery even takes place, this case was contested through an adversarial and contentious process." *Charvat v. Valente*, No. 12-cv-05746, 2019 WL 5576932, at *5 (N.D. Ill. Oct. 28, 2019). It was only after this Court ruled on a fully briefed motion to dismiss and the Parties substantively engaged in discovery that they engaged Judge Denlow for mediation. *See T.K.*, 2022 WL 888943 at *11 ("The best evidence of a truly adversarial bargaining process is the presence of a neutral third-party mediator.") (internal quotations omitted). Even then, the Parties engaged in additional informal discovery and submitted competing mediation statements to Judge Denlow before ultimately agreeing to the Settlement. And indeed, it took a mediator's proposal from Judge Denlow to settle the case, one made after a full-day of mediation and the many months of negotiations leading up to that mediation.

What's more, the arm's-length nature of these negotiations is further confirmed by the Settlement itself: it is non-reversionary, has a common fund calculated based on a higher per-person amount than earlier IRPA settlements, will provide higher cash payments to claiming Damages Subclass Members than comparable IRPA settlements, and contains no provisions that

16

might suggest fraud or collusion, such as a "clear sailing" or "kicker" clause regarding attorneys' fees. *See Snyder*, 2019 WL 2103379 at \*4 (finding settlement negotiated at arm's length where "there is no provision for reversion of unclaimed amounts, no clear sailing clause regarding attorneys' fees, and none of the other types of settlement terms that sometimes suggest something other than an arm's-length negotiation"). In a similar vein, the release is not overbroad. CheckPeople is not getting any release that it is not paying for. Only the Damages Settlement Subclass Members (who are eligible to submit a Claim Form to receive a payment) are releasing their claims; individuals who are only in the Injunction Settlement Class will get injunctive relief under the Settlement, but are not giving up their right to otherwise sue CheckPeople. For these reasons, there should be no question that the Settlement here is entirely free from fraud or collusion.

### C.     The Settlement Treats Class Members Equally.

Next, Rule 23(e)(2) requires the proposed settlement to treat class members "equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). That is true of the Injunction Settlement Class and Damages Settlement Subclass here. Considering the Injunction Settlement Class, each Class Member is entitled to the same prospective relief that requires their identifying information to be split up from the purchasing workflow on CheckPeople's website. Regarding the Damages Settlement Subclass, all claiming Subclass Members are entitled an equal, pro rata share of the Settlement Fund.

"Generally, a settlement that provides for pro rata shares to each class member will meet this standard." *T.K.*, 2022 WL 888943, at \*15; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 840-41 (1999) (describing pro rata distribution of fund as a "straightforward model[] of equitable treatment"). That is precisely what the Settlement provides. The fact that Plaintiffs have each sought a service award for themselves that, if approved, would lead them to receive marginally

more of the Settlement Fund than other Damages Settlement Subclass Members is not problematic. "Equitably relative to each other" does not mean "equally to each other," and absent unusual circumstances, a modest service award to a class representative does not render a proposed settlement unfair, unreasonable, or inadequate. *See T.K.*, 2022 WL 888943 at \*15-16 (finding $2,500 service awards did not render treatment of class members inequitable, noting that "[b]ecause class representatives do more work and take more risks than the average class member, service awards to named class members will generally not raise a red flag") (quotations omitted). The Settlement treats all Class and Subclass Members equitably relative to each other, and all four Rule 23(e)(2) factors thus support preliminary approval here.

### D. The Relief Secured for the Settlement Classes Is Adequate and Warrants Final Approval.

The final and most important factor under Rule 23(e)(2) scrutinizes whether the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2)(C). In making this determination, Rule 23 identifies several sub-factors for the Court to consider, including (i) the cost, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the class; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any side agreements made in connection with the settlement.[5] *Id.* This analysis necessarily encompasses two of the Seventh Circuit's factors: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; [and] (2) the complexity, length, and expense of further litigation[.]" *Wong*, 773 F.3d at 863. Because the first Seventh Circuit factor "[is the] most important factor relevant to the fairness of a class action settlement[,]" it is critically important for a settlement to meet this standard. *In re AT & T Mobility Wireless Data*

---

[5]    Besides the Settlement itself, there are no side agreements between the Parties made in connection with the Settlement to report. Thus, Fed. R. Civ. P. 23(e)(2)(C)(iv) is not a relevant consideration here.

*Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (St. Eve., J.) (internal quotations omitted).

### 1.    The Settlement provides exceptional relief to the Settlement Classes.

The Settlement here builds on similarly sized right of publicity settlements that preceded it. It compares favorably whether the metric is the amount per Damages Settlement Subclass Member used to fund the Settlement, or the net take-home payment that claiming Damages Settlement Subclass Members can expect to receive. Not to be discounted, the Settlement also includes valuable prospective relief that all Inunction Settlement Class Members will automatically receive.

Considering the mechanism used to establish the amount of the Settlement Fund—the dollar amount multiplied by the number of potential Damages Settlement Subclass Members—the Settlement's $65 per person exceeds its predecessors. *See Butler*, No. 19-cv-04871, dkt. 277 (N.D. Ill., Sept. 29, 2022) (granting final approval to IRPA settlement creating $1,208,440 settlement fund of $40 per class member); *Krause v. RocketReach, Inc.*, No. 21-cv-01938, dkt. 97 (N.D. Ill., Sept. 12, 2023) (granting final approval to IRPA settlement creating $1,596,300 settlement fund of $60 per class member); *Ramos, et al. v. ZoomInfo Technologies, LLC*, No. 21-cv-02032, dkts. 104, 115 (N.D. Ill. July 3, 2024) (preliminarily approving settlement creating $11,695,860 IRPA settlement fund based on $30 per person). The estimated net settlement payments of $360 to claiming Damages Settlement Subclass Members also bests the take-home payments in comparable IRPA settlements. *See Butler*, No. 19-cv-04871, dkts. 272, 277 (N.D. Ill., Sept. 7, 2022 and Sept. 29, 2022) (final award of $95 to each IRPA claimant and $380 to each ORPA claimant); *Krause*, No. 21-cv-01938, dkts. 94, 97 (N.D. Ill., Aug. 21, 2023 and Sept.

12, 2023) (final award of approximately $300 to each IRPA claimant).[6] While these results are noteworthy for exceeding their nearest comparators, they further stand out for being obtained in the face of CheckPeople's limited financial resources. (*See* Fraietta Decl. ¶ 14.)These results also come against the backdrop statutory or data privacy settlements that settle for pennies on the dollar, if they include any monetary payment at all. *See In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 740 (9th Cir. 2017), *vacated on other grounds by Frank v. Gaos*, 586 U.S. 485 (2019) (approving *cy pres*-only fund without any payments to class members); *In re Advocate Aurora Health Pixel Litig.*, 22-CV-1253-JPS, 2024 WL 3357730, at *2 (E.D. Wis. July 10, 2024) (finally approving settlement in Meta "tracking pixel" case that capped per-claimant recovery at $50); *Bytedance*, 2022 WL 888943, at *14 (per claimant recovery $3.06 in class action settlement resolving alleged violations of Video Privacy Protection Act and consumer protection statutes); *In re Google Plus Profile Litig.*, 5:18-CV-06164-EJD, 2021 WL 242887, at *5 (N.D. Cal. Jan. 25, 2021) (approving settlement regarding exposure of Google+ users' information that paid individuals $2.50); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013) (approving settlement under California's right of publicity statute that resulted in $15 payments to but would have been *cy pres* only if claims rate were higher). The Settlement's forward-looking relief is also meaningful. All Injunction Settlement Class Members are entitled to prospective relief that aimed at remedying the underlying, allegedly unlawful conduct. Specifically, CheckPeople must stop displaying Class Members' names and other identifying information on any page on their websites that includes a subscription offer to

---

[6]    While the net take-home settlement amount for Illinois claimants in *Fischer, et al. v. Instant Checkmate LLC, et al.*, No. 19-cv-4892, dkts. 285, 286 (N.D. Ill. Feb. 15, 2024) was more than $700, and came from a fund with a size based on on $247 per class member, that case resolved the claims of an IRPA class that was adversarially certified prior to settlement, and therefore commanded a premium.

CheckPeople's products or services. (Settlement § 2.2.) These requirements go further than the initial changes CheckPeople made to its website after March 31, 2023, and are aimed at putting an end to the behavior that led to the lawsuits in the first place. Critically, members of the Injunction Settlement Class who are not Damages Settlement Subclass Members—that is, they were not searched in a way that led to a subscription purchase and are not eligible for a monetary payment under the Settlement—are excluded from the release. (*Id.* § 3.1.) Thus, they will receive real prospective benefits from the Settlement while retaining any claims—including claims for monetary damages—that they may have against CheckPeople.

### 2. The benefits of settlement outweigh the cost, risk, and delay of further litigation.

"As courts recognize, a dollar obtained in settlement today is worth more than a dollar obtained after a trial and appeals years later." *Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *4 (N.D. Ill. Oct. 10, 1995). In evaluating the adequacy of the relief provided to the class, courts compare the cost, risks, and delay of pursing a litigated outcome to the settlement's immediate benefits. Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 amendment. The Settlement here meets both the 23(e)(2)(C) requirements and the relevant Seventh Circuit considerations because it provides immediate relief while avoiding potentially years of risky litigation and appeals. *See Schulte*, 805 F. Supp. 2d at 586 ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation."). The risk that Plaintiffs and the Settlement Classes would otherwise ultimately obtain no relief whatsoever was not insignificant.

Most immediate would be the risk that the putative classes would not obtain adversarial class certification. *See T.K.*, 2022 WL 888943 at *13 (noting obstacle posed by adversarial class certification if litigation were to continue rather than settle). For example, the class certification

decision in *Fischer*—the first in this type of "free preview" right of publicity case—demonstrates the risk that class members face. There, the court certified two classes, but declined to certify a third class of individuals appearing in search results. *Fischer*, 2022 WL 971479, at *3, *15. While the court's decision turned on the facts of that particular case and the specific class definition proposed for certification, *id.* at *15, for present purposes it illustrates that class certification would not be guaranteed. *See also Dancel v. Groupon, Inc*., No. 18 C 2027, 2019 WL 1013562, at *1 (N.D. Ill. Mar. 4, 2019), *aff'd*, 949 F.3d 999 (7th Cir. 2019) (denying motion to certify IRPA class because whether any given username was sufficient to identify an individual presented individual inquiries that defeated predominance).

Summary judgment would mean another opportunity for CheckPeople to reraise the arguments that it lost at the motion to dismiss stage, as well as advance new arguments—as foreshadowed in its Answer—such as defenses based on First Amendment, Communications Decency Act, and Dormant Commerce Clause grounds. An adverse decision on any of these potentially dispositive issues could singlehandedly doom this action and leave the Class and Subclass with nothing were litigation to continue. *See, e.g.*, *Bonilla v. Ancestry.com Operations Inc.*, 628 F. Supp. 3d 812 (N.D. Ill. 2022) *reconsideration denied*, No. 20 C 7390, 2023 WL 3602801 (N.D. Ill. May 23, 2023) (granting summary judgment in favor of website operator on IRPA claims).

Even if they prevailed at trial, the Classes could face serious obstacles in actually recovering what could be substantial damages against the CheckPeople, especially in light of its financial condition. *See*, *e.g.*, *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1123 (9th Cir. 2022) (vacating denial of post-trial motion challenging constitutionality of $925 million damages award in TCPA case, remanding for further consideration); *Golan v. FreeEats.com, Inc.*, 930

22

F.3d 950, 955 (8th Cir. 2019) (statutory award in TCPA class action of $1.6 billion reduced to $32 million); *but see United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020), *cert. dismissed*, 141 S. Ct. 729 (2021) (statutory award of $280 million for violating various telemarketing statues over 65 million times did not violate due process). Likewise, legislation may be amended while a class action is pending in a way that threatens the entire case. *See Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 629-30 (E.D. Mich. 2017) (evaluating the retroactive effect of statutory amendment on pending class action

As the foregoing makes clear, the risk that continued litigation "would provide [c]lass [m]embers with either no in-court recovery or some recovery many years from now" is real. *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. at 964; *Charvat*, 2019 WL 5576932, at *7 (recognizing that absent settlement "any relief to class members would still be far down the road and may ultimately be entirely denied." In contrast, "[a]pproving the proposed settlement agreement will end the case and cause benefits to flow in short order." *Id.*; *see also Young*, 2020 WL 969616, at *5 ("If this case had been litigated to conclusion, all that is certain is that plaintiffs would have spent a large amount of money, time, and effort.") (citation omitted). Thus, given the substantial risks, expense, and delay that would accompany further litigation, the Settlement offers substantial and immediate value relative to the strength of Plaintiffs' case. This crucial factor therefore strongly supports final approval.

### 3. The method of distributing relief to the Damages Settlement Subclass is effective and supports final approval

The "effectiveness of [the]… method of distributing relief to the class" weighs strongly in favor of the adequacy of this Settlement under Rule 23(e)(2)(C)(ii). An effective distribution method "get[s] as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." 4 Newberg on Class Actions § 13:53 (6th ed.); *T.K.*,

2022 WL 888943, at *14 (underscoring the importance that processes should not be "so complex that they discourage class members from pursuing valid claims"). The claims and distribution processes here are straightforward.

"A requirement that potential claimants fill out a form in order to collect from the settlement fund seldom raises such concerns." *Id*. That is all that is required from Damages Settlement Subclass Members here. (Settlement §§ 1.2, 1.4, 2.1(a).) The Claim Form "is not unduly burdensome, long, or complex." *Schulte*, 805 F. Supp. 2d at 591. "All information called for on the form is required of the claims administrator in order for it to process claims." *Id*. Furthermore, "[t]he parties' use of a settlement website … suggests that the claims process was designed to encourage—not discourage—the filing of claims." *Id*. "For example, the ability to submit a claim online through the settlement website allow[s] Class Members to submit a claim without the need to pay for a stamp." *Id*. The Settlement also offered Class Members several easy options for receiving their payment, including digital payment options through Venmo and Zelle, in addition to a paper check option. (Settlement § 1.4.) The claims rate reflects that claiming Damages Settlement Subclass Members were not discouraged from participating in the Settlement.

"In addition to the method of submitting a claim, courts must also consider how claims are paid out." *T.K.*, 2022 WL 888943 at *14; *see Crumpton v. Octapharma Plasma, Inc.*, No. 19-cv-08402, dkt. 92 (N.D. Ill. Feb. 16, 2022) (approving settlement where settlement administrator processed claims under counsel's oversight and distributed *pro rata* shares to class members with valid claims). "Courts are especially wary of complex claims processes paired with either claims-made settlements, distributing only the amount actually claimed by the class members, or reversionary funds." *T.K.*, 2022 WL 888943 at *14 (quotations omitted). The Settlement here is

24

neither; CheckPeople established a $2,598,050 Settlement Fund no matter the number of claims filed, and with no possibility of reverter. Consequently, "it seems unlikely that the claims process is designed to limit the 'take rate' of Class Members." *Schulte*, 805 F. Supp. 2d at 591. *See also T.K.* 2022 WL 888943 at *15 ("[B]ecause no possibility of reversion exists here, it creates little incentive for gamesmanship by Defendant[] or class counsel."). This sub-factor also favors final approval of the Settlement.

### 4.    The terms of the requested attorneys' fees are reasonable.

The next relevant consideration under Rule 23(e)(2)(C)'s evaluation of the adequacy of relief are "the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii).

Class Counsel separately petitioned the Court for an award of reasonable attorneys' fees after the Settlement Class received Notice and before the deadline to object. (Dkt. 43.) They also ensured that request was posted on the Settlement Website so that the Settlement Classes had access to it. The Settlement's contemplated method of calculating attorneys' fees (i.e., the percentage-of-the-fund method) and Class Counsel's request for thirty-five percent (35%) of the non-reversionary net Settlement Fund is reasonable and predicated on the outstanding relief provided to the Settlement Class. (Settlement § 8.1.) "[T]he percentage method is employed by the vast majority of courts in the Seventh Circuit," and "the typical fee [is] between 33 and 40 percent." *T.K.*, 2022 WL 888943 at *24 (quotations omitted); *see also, e.g., Fischer*, dkt. 286 ¶ 17 (awarding 35% of each state-specific settlement fund in right of publicity case); *Krause*, dkt. 97 ¶ 14 (awarding 35% of common fund in IRPA case); *Butler*, dkt. 277 at 6 (same); *Fischer*, dkt. 286 ¶ 17 (same); *Alvarado v. Int'l Laser Prods., Inc.*, No. 18-cv-7756, Dkt. 70 (N.D. Ill. Jan. 24, 2020) (awarding 35% of fund); *Lopez-McNear*, No. 19-cv-2390, Dkt. 69 (awarding 35% of fund); *Cornejo v. Amcor Rigid Plastics USA, LLC*, No. 1:18-cv-07018, Dkt. 57 (N.D. Ill. Sept.

10, 2020) (awarding 35% of fund). Again, there is no clear-sailing agreement, and the Settlement Agreement permits CheckPeople to challenge the amount of any fees requested. (Settlement § 8.1.) With respect to the timing of payment of attorneys' fees, the Settlement allows certain Class Counsel to elect to be paid their portion of attorneys' fees within seven days after the Court's entry of a final approval order; otherwise, fees will be paid within five business days after final judgment, including any appeals. (*Id.* § 8.2; Exhibit E.)

For the immediate purposes of evaluating the adequacy of relief under Rule 23(e)(2)(C), however, the important thing to note is that the Court's decision on settlement approval is completely distinct from its determination of fees. *Id*. ("Most importantly, with respect to the Court's consideration of the Settlement's fairness, the approval of attorneys' fees remains entirely separate from approval of the Settlement.").

### E. The Remaining Considerations Set Forth by the Seventh Circuit Support Approval of the Settlement.

In addition to the requirements that overlap with those now explicitly required by Rule 23(e), the Seventh Circuit requires a few additional considerations: the class's reaction to the settlement, the opinion of competent counsel, and whether the settlement raises any red flags that courts should be wary of. *Wong*, 773 F.3d at 863. Here, the positive reaction of the Settlement Classes, the support of Class Counsel, and the lack of red flags all favor approval.

### 1. The Reaction of the Settlement Classes Favors Approval.

Lack of opposition to a class action settlement "indicates that the class members consider the settlement to be in their best interest." *Am. Int'l Grp., Inc.*, *v. ACE INA Holdings, Inc.*, 2012 WL 651727, at *6 (N.D. Ill. 2012). Here, the Settlement Administrator diligently implemented the Notice plan outlined in the Agreement, and the objection and exclusion deadlines have passed without a single person objecting to or opting out of the Settlement. That not one person

has objected to the Settlement is powerful evidence of the Settlement Class's support for the Settlement. *See McDaniel v. Qwest Commc'ns Corp.*, 2011 WL 13257336, at *4 (N.D. Ill. Aug. 29, 2011) (finally approving settlement with no objections and noting that "[a]n absence of objection is a 'rare phenomenon[]' and 'indicates the appropriateness of the request[]'") (citations omitted); *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (stating that "[t]he absence of objection to a proposed class settlement is evidence that the settlement is fair, reasonable and adequate").

Similarly, the 11.14% claims rate from the Settlement Class also indicates a robust positive reaction from the Settlement Class. *See Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, FED. TRADE COMM'N, 11 (Sept. 2019) ("Across all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (*i.e.*, cases weighted by the number of notice recipients) was 4%."). The rate at which the Damages Settlement Subclass Members participated in this Settlement is comparable to settlements in other privacy class actions, including under the IRPA. *See Krause*, 21-cv-01938, dkt. 94, at 1 (12% claims rate in IRPA class action); *Sekura v. L.A. Tan Enters., Inc.*, 2015-CH-16694 (Cir. Ct. Cook Cnty. Dec. 1, 2016) (15% claims rate in biometric information privacy act ("BIPA") case); *Kusinski*, 2017-CH-12364 (12.7% claims rate in BIPA case); *Thome*, No. 19-cv-6256, dkt. 90 (10% claims rate in BIPA case); *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) (5% claims rate in BIPA case). The strong response rate here combined with a total lack of objections and a single opt out thus strongly supports granting final approval to the Settlement.

### 2. Experienced Counsel's Belief that the Settlement is Beneficial to the Class Weighs in Favor of Final Approval.

The opinion of competent counsel also supports final approval of the Settlement. Where

class counsel has "extensive experience in consumer class actions and complex litigation[,]" their "belie[f] that the [s]ettlement is beneficial to the [c]lass" supports approval of the settlement. *Schulte*, 805 F. Supp. 2d at 586; *see also Retsky Family Ltd. P'ship*, 2001 WL 1568856, at *3 (finding plaintiff's counsel competent, and their endorsement of a settlement thus supporting approval, where counsel were "experienced and skilled practitioners in the [relevant] field, and [were] responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted") (internal quotations omitted).

Here, as discussed at length in Plaintiffs' motion for preliminary approval (dkt. 41 ¶¶ 4, 6-7), Class Counsel are competent to give their opinion on this Settlement. For the reasons discussed above and in light of the positive response to the Notice, Class Counsel continues to believe that the Settlement provides outstanding monetary and prospective relief to the Settlement Class without the uncertainty and delay that years of litigation would bring. (Fraietta Decl. ¶ 19.) Thus, Class Counsel's opinion is that the Settlement is in the best interest of the Settlement Class. (*Id.*)

For these reasons, the opinion of Class Counsel weighs in favor of final approval.

### 3.    The Settlement Raises No Red Flags.

Finally, the Settlement raises none of the red flags identified by the Seventh Circuit in analyzing class settlements. In *Eubank v. Pella Corp.*, the Seventh Circuit identified "almost every danger sign in a class action settlement that our court and other courts have warned district judges to be on the lookout for[.]" 753 F.3d 718, 728 (7th Cir. 2014). Those signs included (i) a single class containing two adverse subgroups, (ii) a familial relationship between class counsel and the class representative, (iii) failure to establish the amount of class member recovery, (iv) the reversion of any unawarded attorneys' fees to defendant, (v) an advance of attorneys' fees before notice of the settlement was provided to class members, (vi) a provision in the settlement

agreement denying incentive awards to class representatives who objected to the settlement, (vii) providing some class members only coupons, and (viii) a complicated claims procedure creating substantial obstacles to recovery. *Id.* at 721-28.

Here, none of those red flags are present. There are no adverse subgroups in the class. Further, the Class Representatives have no familial relationship with Class Counsel or any member of their respective law firms. The claims process here was simple and straightforward: Damages Settlement Subclass Members were able to submit the short, one-page Claim Form either online through the Settlement Website, or by mail by submitting the postage-prepaid Claim Form. Any unawarded attorneys' fees will be distributed to the claiming Damages Settlement Subclass Class Members, not revert to CheckPeople (Settlement § 8.1); no attorneys' fees will be paid to Class Counsel until after final approval of the Settlement; and there is no provision in the Settlement Agreement denying an incentive award to a named plaintiff who does not support the Settlement.

In short, the Settlement displays no warning signs that should give this Court pause. The Settlement should therefore be finally approved.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order confirming the certification of the Settlement Classes for purposes of entering the final judgment, finally approving the Parties' Settlement, and ordering such other relief as this Court deems reasonable and just.[7]

---

[7]    For the Court's convenience, Plaintiff will submit a proposed final approval order to the Court's designated email address prior to the October 31, 2024 final approval hearing.

Respectfully Submitted,

**SHERRY GAUL** and **STEPHANIE LUKIS,**
individually and on behalf of all others similarly
situated,

Dated: October 17, 2024

By: */s/ Philip L. Fraietta*
       Philip L. Fraietta

Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, P.A.
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Tel: 646.837.7150

J. Eli Wade-Scott
ewadescott@edelson.com
Michael W. Ovca
movca@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 N. LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Class*